UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YOLANDA MARY KALB,<br><br>                        Plaintiff,<br>  v.<br>CITY OF OCEANSIDE, a public entity; et al.,<br><br>                        Defendants. | CASE NO: 11-CV-00847W<br><br>**ORDER GRANTING DEFENDANTS' SUMMARY-JUDGMENT MOTION [DOC. 40]** |

On April 21, 2011, Plaintiff Yolanda Mary Kalb filed this lawsuit under 42 U.S.C. § 1983 against the City of Oceanside, Oceanside Police Department, and Officers Brian Wray, Marcus Woods, Nicholas Olsen, Justin Pecchia, and Jon Seabron. Plaintiff alleges excessive force and false arrest in violation of her Fourth Amendment rights.

Defendants have filed a summary-judgment motion. Plaintiff Kalb opposes the motion. The Court decides the matter on the papers submitted and without oral argument under Civil Local Rule 7.1(d)(1). For the reasons stated below, the Court **GRANTS** Defendants' motion [Doc. 40].

//

//

I. BACKGROUND

On the night of June 23, 2010, Oceanside Police Officer Brian Wray responded to a complaint that an individual had attempted to expose himself in a local restaurant. (*See Wray Decl.* [Doc. 40-13] ¶¶ 1-2; *Woods Decl.* [Doc. 40-12] ¶ 2.) Based on the individual's description, Officer Wray suspected Joshua Kalb, Plaintiff Yolanda Kalb's son, was the individual in question.[1] (*Wray Decl.* ¶ 3.) Joshua had a history of mental-health problems, and had been arrested multiple times for substance abuse and "DUI." (*Compl.* [Doc. 1], ¶ 14; *Y. Kalb Decl.* [Doc. 44-1], ¶ 3; *Def.s' NOL*, Ex. 22 ("J. Kalb Depo.") [Doc. 40-3], 35:1–21.)

Officer Wray approached Joshua in an alley behind the Sunshine Brooks Theater, which Yolanda co-manages. (*Wray Decl.*, ¶ 3; *Compl.*, ¶ 13.) Upon seeing Officer Wray approach, Joshua ran through the theater's back door and locked the door. (*Wray Decl.*, ¶ 2.) Officer Wray knocked on the door, and Yolanda responded. (*Wray Decl.*, ¶ 2, *Kalb Decl.*, ¶ 3.) While talking to Yolanda, another theater employee told Officer Wray that Joshua had run out of the front door and headed south. (*Wray Decl.*, ¶ 3.)

Officer Wray left the theater to pursue Joshua, and was joined by Officer Marcus Woods. The two officers found Joshua in the bar next door. (*Wray Decl.*, ¶ 3.) As Officer Woods entered the bar, he heard Officer Wray yell, "turn around and place your hands behind your back." (*Woods Decl.*, ¶ 4.) Joshua then charged Officer Wray and threw a punch, which glanced the top left side of Officer Wray's head. (*Wray Decl.*, ¶ 4; *Def.s' NOL*, Ex. 24 ("Buxton Depo.") [Doc. 40-3], 19:19–21 and Ex. 25 ("Diamond Depo.") [Doc. 40-4], 20:9–22.) Officer Woods tackled Joshua by the bar's entrance, but Joshua fought to get free and stood back up. (*Woods Decl.*, ¶ 4.) The two officers continued to struggle with Joshua, and they fell back inside the bar's entrance, knocking over a small wooden podium, a plant and eventually knocking up against a large wooden

---

[1] Generally, this Court's orders refer to parties by their last names. However, because the factual background involves two members of the Kalb family, Plaintiff Mary Kalb and Joshua Kalb, this order will refer to their first names.

Tiki. (*Wray Decl.*, ¶ 4; *Woods Decl.*, ¶ 5; *Buxton Depo.*, 20:25–21:1.)  Although the officers managed to get Joshua onto the ground again, they were having a hard time controlling him, and it did not look like they were going to be able to keep Joshua down. (*Def.s' NOL*, Ex. 26 ("Blackburn Depo.") [Doc. 40-4]., 44:7–14.)  Ken Jarboe, the bar's security guard, then joined to help the officers. (*Id.*; *Woods Decl.*, ¶ 6; *Wray Decl.*, ¶ 5.)

As the struggle with Joshua continued inside the bar, Officer Olsen arrived at the scene. (*Olsen Dec.* [Doc. 40-8], ¶ 3.)  He observed Officers Woods and Wray on either side of Joshua, who was on the ground, and the bar's security guard holding Joshua's legs. (*Olsen Decl.*, ¶ 3; *Woods Decl.*, ¶ 6; *Wray Decl.*, ¶ 5.)  The officers repeatedly told Joshua to stop resisting. (*Olsen Decl.*, ¶ 4; *Woods Decl.*, ¶ 6; *Wray Decl.*, ¶ 5.)  Bar patrons observing the melee stated that Joshua was "fighting like a furious beast," that he "just went crazy," and that he appeared to either want to run away or harm the officers. (*Def.s' NOL*, Ex. 21 ("Blackburn & Diamond Statements") [Doc. 40-2], 5:4–5; Ex. 25 ("Diamond Depo.") [Doc. 40-4], 20:15–22; *Blackburn Depo.*, 41:22–42:1.)

Eventually, Officer Woods managed to handcuff Joshua's right wrist, but Joshua forcefully hid his left hand under his body. (*Wray Decl.*, ¶ 5; *Woods Decl.*, ¶ 6; *Olsen Decl.*, ¶ 4.)  Officer Wray believed that Joshua was attempting to grab a weapon with his left hand and "distributed two 'distraction blows'" with his right fist to Joshua's rib cage. (*Wray Decl.*, ¶ 5.)

At approximately this time, Yolanda entered the bar. (*Y. Kalb Decl.* [Doc. 44-1], ¶ 4; *Wray Decl.*, ¶ 5; *Buxton Depo.*, 23:12–22.)  She approached to within one to three feet of the struggle and began telling Joshua to calm down. (*Y. Kalb Decl.*, ¶¶ 5–6.)  When Officer Wray struck Joshua in the ribs, Yolanda told the officers to stop hurting her son. (*Y. Kalb Decl.*, ¶¶ 6–8; *Diamond Depo.*, 59:15–21.)  Joshua then called-out for her assistance. (*Diamond Depo.*, 29:6–10, 34:15–17.)  Yolanda contends that "up to this time," she did not touch any officer and when told to get back, took one step back;

however, she reached toward her son, as if wanting to help him. (*Y. Kalb Decl.*, ¶¶ 9–10; *Y. Kalb Depo.*, 281:13–16; *Diamond Depo.*, 59:5–10, 64:5–8.[2])

As the struggle continued, Officer Wray was concerned about the patrons in the small bar, and that the situation could get out of control. (*Wray Decl.*, ¶ 6.) Officer Olsen took Officer Wray's place in the struggle with Joshua. (*Id.*, ¶ 7; *Olsen Decl.*, ¶ 4.) Officer Wray then stood up, took one step, and grabbed Yolanda by the wrists. (*Wray Decl.*, ¶ 7; *Y. Kalb Decl.*, ¶ 11.) According to Yolanda's declaration, Officer Wray yanked her arms downward, then up over her head and moved her back (approximately a foot) up against the wall. (*Kalb Decl.*, ¶¶ 12, 14, 16; *Diamond Depo.*, 77:4–8.) She immediately experienced pain in her wrist and arm, which led her to scream and act in a way that "anybody would think that I was pretty much a raving maniac." (*Y. Kalb Depo.*, 213:15–19.) She further concedes that given the way she was screaming and the pain she was experiencing, witnesses could have "interpreted [her] to be resisting" Officer Wray. (*Id.*, 280:22–281:5.) Officer Wray then placed Yolanda in handcuffs and pushed her onto a bench against the wall. (*Kalb Decl.*, ¶ 17.)

Yolanda was eventually seen by paramedics and transported to the hospital. While at the hospital, Yolanda stated that she had consumed one or two glasses of wine that night. (*Y. Kalb Depo.*, 88:4–25.) Officer Wray then read Yolanda her Miranda rights. (*Wray Decl.*, ¶ 12.) She was taken into custody and charged with violation of California Penal Code 148(1), for resisting an officer. (*Id.*, ¶ 8; *See Def.s' RJN* [Doc. 40-5], Ex. 2.) Joshua was also arrested and pled guilty to violation of California Penal Code 69. (*See Def.s' RJN*, Ex. 1.)

//

---

[2] The Officers' version of events at this point differs significantly. Officers testified that they told Yolanda several times to back away, that she refused and made physical contact with Officers Woods and Wray. (*Wray Decl.*, ¶ 6; *Woods Decl.*, ¶ 7; *Olsen Decl.*, ¶ 5.) Bar patrons confirm the officers' version and testified that Yolanda Kalb was very emotional, ignored repeated commands to back away from the scene, and she attempted to pull officers off Joshua. (*Buxton Depo.*, 24:17–19, 25: 2–5, 26:10–25; *Diamond Depo.*, 29:6–10, 34:5–22, 38:1–7, 59:5–25, 61:20–62:2, 64:4–8; *Blackburn Depo.*, 90:15–91:8, 131:23–132:15.)

## II. LEGAL STANDARD

Summary judgment is appropriate under Rule 56(c) where the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Freeman v. Arpaio, 125 F.3d 732, 735 (9th Cir. 1997). A dispute about a material fact is genuine if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. Celotex, 477 U.S. at 323. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to make a showing sufficient to establish an element essential to that party's case on which that party will bear the burden of proof at trial. Id. at 322-23. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809 F.2d 626, 630 (9th Cir. 1987).

"The district court may limit its review to the documents submitted for the purpose of summary judgment and those parts of the record specifically referenced therein." Carmen v. San Francisco Unified School Dist., 237 F.3d 1026, 1030 (9th Cir. 2001). Therefore, the court is not obligated "to scour the record in search of a genuine issue of triable fact." Keenan v. Allen, 91 F.3d 1275, 1279 (9th Cir. 1996) (citing Richards v. Combined Ins. Co., 55 F.3d 247, 251 (7th Cir. 1995)).

If the moving party meets its initial burden, the nonmoving party cannot defeat summary judgment merely by demonstrating "that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986); Triton Energy Corp. v. Square D Co., 68 F.3d 1216, 1221 (9th Cir.

1995) (citing Anderson, 477 U.S. at 252) ("The mere existence of a scintilla of evidence in support of the nonmoving party's position is not sufficient."). Rather, the nonmoving party must "go beyond the pleadings and by her own affidavits, or by 'the depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Celotex, 477 U.S. at 324 (quoting Fed.R.Civ.P. 56(e)).

When making this determination, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. See Matsushita, 475 U.S. at 587. "Credibility determinations, the weighing of evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, [when] he [or she] is ruling on a motion for summary judgment." Anderson, 477 U.S. at 255.

## III.   DISCUSSION

### A.   Yolanda Kalb's objections are overruled.

Yolanda has filed a number of objections to Defendants' evidence. The vast majority of the objections need not be decided because much of the evidence objected to was not relied upon in deciding the motion. Specifically, the Court did not rely on the following evidence: Defendants' Exhibits 1–11, 15, and 16, which are attached to the notice of lodgement; and RJN 3, which is attached to Defendants' request for judicial notice.

With respect to Exhibit 21 (erroneously identified as Michael Buxton's transcribed recorded statement), Jon Seaborn's declaration, Joshua Kalb's Plea of No Contest / Guilty in San Diego Superior Court Case No. CN278689, and the Misdemeanor Complaint filed against Yolanda Kalb in San Diego Superior Court Case No. CN278745, the Court overrules the objections with respect to those portions of the evidence cited in this order. The Court also **GRANTS** Defendants' request for judicial notice.

B.  **Summary judgment is appropriate as to Officers Woods, Olsen, Pecchia and Seaborn.**

Defendants argue that Officers Woods, Olsen, Pecchia and Seaborn should be dismissed because "the undisputed evidence shows that Officer Wray was the only defendant officer who detained plaintiff and he was the one who tried to subdue and later handcuff her." (*P&A* [Doc. 40-1], 7:9–13.) In support of this argument, Defendants provide declarations from each of the officers in which they state that they were not involved in her arrest. (*Olsen Decl.*, ¶ 6; *Pecchia Decl.* [Doc. 40-9], ¶ 6; *Seaborn Decl.* [Doc. 40-11], ¶ 9; *Woods Decl.*, ¶ 7.) Additionally, other than Officer Woods' statement that he used his left arm to push Yolanda back approximately 3 times while simultaneously attempting to subdue Joshua, these officers did not have any physical contact with Yolanda.[3] (*Id.*) Furthermore, consistent with these declarations, Officer Wray testified that he restrained and arrested Yolanda. (*Wray Decl.*, ¶ 7.)

In response, Yolanda provides no evidence contradicting the officers' statements. Nor does she provide any evidence that anyone other than Officer Wray had physical contact with her. Instead, Yolanda argues that these officer defendants should not be dismissed because she is "uncertain about which officer was involved with which actions." (*Opp.* [Doc. 44], 8:10–13.)

But Yolanda's uncertainty about who was involved in her arrest is insufficient at this stage in the litigation. Defendants have satisfied their initial burden of providing evidence that they had no contact with her. The burden, therefore, has shifted to Yolanda to provide either conflicting evidence that establishes a disputed issue of fact or

---

[3] In arguing that summary judgment is not appropriate on her excessive force claim, Yolanda contends that she did not have any physical contact with the officers while they were trying to restrain Joshua on the floor. (*See Kalb Decl.*, ¶ 6 ("While I was about three feet from the officers at that point, I never touched any officer during this incident.").) Accordingly, because the Court must accept Yolanda's version of events, the Court disregards Officer Woods' statement that he used his left arm to push Yolanda away from the scene. However, even if the Woods' statement was undisputed, such contact is insufficient to establish an excessive force claim, under the circumstances of this case.

1  to provide some authority for the proposition that these officers may be liable for
2  excessive force despite their lack of contact with her.  Having failed to do either, Officers
3  Woods, Olsen, Pecchia and Seabron are entitled so summary judgment. See Matsushita,
4  475 U.S. at 586 (the nonmoving party cannot defeat summary judgment merely by
5  demonstrating "that there is some metaphysical doubt as to the material facts.")

C.   **Officer Wray did not use excessive force.**

In determining whether an officer used excessive force, courts consider "the nature and quality of the intrusion on the individual's Fourth Amendment interests against the countervailing governmental interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989).  Courts examine the nature of the crime, the threat to officers, whether the suspect resists arrest, the amount of force used to arrest, the availability of alternatives to the amount of force used, and the mental and emotional state of the plaintiff. Lutchel, 623 F.2d at 980 (citing Graham, 490 U.S. at 396; Davis v. City of Las Vegas, 478 F.3d 1048, 1055-57 (9th Cir. 2007); Deorle v. Rutherford, 272 F.3d 1272, 1282 (9th Cir. 2001)).  Although a court views evidence in the light most favorable to the non-moving party in summary judgment, "[t]he 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." Lutchel, 623 F.2d at 980 (citing Graham, 490 U.S. at 396, 109 S.Ct. 1865).

Here, the government interest began with the need to investigate a complaint that someone, matching Joshua's description, was exposing himself in a local restaurant. The government interest quickly expanded to the need to subdue a violent suspect, who assaulted police officers, and to protecting those in the vicinity of the melee, including the bar patrons, fellow officers and Yolanda.  Theses interests are established by the following undisputed facts.

When officers entered the bar, Joshua immediately charged and punched the side of Officer Wray's head. (*Wray Decl.*, ¶ 4; *Buxton Depo.*, 19:19–21; *Diamond Depo.*,

20:9-22.) In attempting to take Joshua into custody, there is no dispute that Joshua put up significant resistance, causing the officers to fall to the ground and knock over furnishing in the bar's entrance. (*Woods Decl.*, ¶¶ 4-6; *Wray Decl.*, ¶¶ 4-5; *Buxton Depo.* 20:25-21:1; *Blackburn Depo.*, 44:7-14.) Patrons characterized Joshua as "fighting like a furious beast," and felt that Joshua appeared to want harm the officers. (*Blackburn & Diamond Statements*, 5:4-5; *Diamond Depo.*, 20:15-22; *Blackburn Depo.*, 41:22-42:1.) These facts establish that officers were faced with a rapidly deteriorating and dangerous situation that required split second decisions. (*See also Diamond Depo.*, 37:12-14; *Blackburn Depo.*, 44:7-14; *Wray Decl.*, ¶ 5.)

It is also undisputed that when Yolanda entered the bar, the struggle with Joshua was ongoing. Yolanda testified that she saw Officer Wray strike Joshua in the ribs and began telling the officers to stop hurting her son. (*Y. Kalb Decl.*, ¶¶ 6-8, *Diamond Depo.*, 59:15-21.) During this time, Joshua refused to remove his left hand from under his body, leading Officer Wray to believe that Joshua might be trying to grab a weapon. (*Wray Decl.*, ¶ 5.) Meanwhile, Yolanda stood within 3 feet of the struggle, told officers to stop hurting her son, and appeared to be reaching toward Joshua as he pleaded with her to help. (*Y. Kalb Decl.*, ¶¶ 5-6, 8; *Diamond Depo.*, 59:5-10, 64:5-8.)

Based on these undisputed facts, Officer Wray was reasonably concerned for the safety of the patrons, the officers and Yolanda, and that the situation could get further out of control. Officer Wray did not need to wait to see if Yolanda would succomb to her son's pleas for assistance before deciding to use force to remove her from the scene so the other officers could handcuff Joshua.

Next, the Court considers the nature and quality of the intrusion on Yolanda's Fourth Amendment rights by evaluating the "the type and amount of force inflicted" upon her. Jackson, 268 F.3d at 652-653. According to Yolanda's version of events, Officer Wray stoop up from the melee, and took one long step toward her, and grabbed both of her arms. (*Y. Kalb Decl.*, ¶¶ 11-12.) Officer Wray yanked her arms downward towards the floor, and then yanked her arms up over her head, raising her from the floor

with the motion. (*Id.*, ¶¶ 12–14.) With her arms over her head, Yolanda was forced back against the wall, where there was a bench that caused her to awkwardly lean backward. (*Id.*, ¶ 16.) As a result, the combination of the motion to move her against the wall and location of the bench caused her to hit her head against the wall. (*Id.*) Aside from stating that she experienced pain in her wrists when Officer Wray grabbed her arms, and "excruciating pain" when he raised her arms over head, Yolanda has provided no other evidence of a physical injury. (*See Y. Kalb Decl.*, ¶¶ 12, 14.) Defendants state that Yolanda suffered a dislocated elbow, which was repaired at the hospital. (*See Def.s' Sep. State. Of Facts* [Doc. 40-6], No. 28.)

Based on Yolanda's version of events, the intrusion on Yolanda's rights was minimal. In short, the force used consisted of grabbing her wrists, "yanking" them forcefully up and down, and moving her back approximately a foot to the wall. Her injury was minor and Yolanda has provided no evidence that the injury has any lasting effects. Accordingly, given the violent and rapidly deteriorating situation faced by the officers attempting to subdue Joshua, the Court finds Officer Wray's use of force against Yolanda was reasonable, and thus no constitutional violation occurred.

Yolanda's opposition, nevertheless, asserts that summary judgment is not appropriate because a factual disputes exists regarding whether Yolanda touched any officer. (*Opp.*, 6:1–2.) Yolanda Kalb is correct that whether she touched the officers is a disputed issue of fact. However, such fact is not material given the other undisputed evidence.

There is no doubt that Officer Wray's defense would have been even stronger if (as bar patrons and officers testified) it was undisputed that Yolanda attempted to pull officers off Joshua. Nevertheless, for the reasons explained above, the undisputed facts easily justify Officer Wray's use of force against Yolanda. Accordingly, the Court finds Officer Wray is entitled to summary judgment on the excessive force claim.

//

**D.     Officer Wray had probable cause to arrest Yolanda Kalb.**

In the Complaint, Yolanda also charges Officer Wray with false arrest. Officer Wray contends this claim lacks merits because he had probable cause to arrest Yolanda. The Court agrees.

As an initial matter, Yolanda's opposition does not address the false arrest claim. Rather, with respect to the Fourth Amendment cause of action, Yolanda only addresses the excessive force claim. (*See Opp.*, 6:7–8:7.) The Court, therefore, construes Yolanda's failure to address the false arrest claim as a concession to its merits and, on that basis, finds summary judgment appropriate.

Moreover, notwithstanding Yolanda's failure to address this claim, the undisputed facts establish that Officer Wray had probable cause to arrest her. "Probable cause exists when, under the totality of the circumstances known to the arresting officers (or within the knowledge of the other officers at the scene), a prudent person would believe the suspect had committed a crime." Blankenhorn v. City of Orange, 485 F.3d 463, 471 (9th Cir. 2007) citing Dubner v. City & County of San Francisco, 266 F.3d 959, 966 (9th Cir. 2001).

As stated above, the Court finds that Officer Wray used reasonable force in removing Yolanda Kalb from the altercation between officers and Joshua. Additionally, based on Yolanda's deposition testimony, there is no dispute that when Officer Wray grabbed and yanked her arms, Yolanda began to scream and acted like a "raving maniac." (*Y. Kalb Depo.*, 213:15–19.) Indeed, at least one of the bar's patrons testified that "it was like she was turning into her son." (*Diamond Depo.*, 38:1–7.) And Yolanda further admitted during her deposition that given the way she was screaming and the pain she was experiencing, it was reasonable to interpret her actions as resisting Officer Wray. (*Y. Kalb Depo.*, 280:22–281:5.) Based on these undisputed facts, the Court finds Officer Wray had probable cause to arrest Yolanda.

Moreover, the Court also finds Officer Wray had probable cause to arrest Yolanda for interfering with the officers' performance of their duties even before he stood up and

grabbed Yolanda's arms. Again, as stated above, there is no dispute that just before Yolanda entered the bar, the officers were involved in a violent struggle with her son. While in the midst of this struggle, Yolanda approached within a few feet of the altercation, and told officers to stop hurting her son while Joshua pleaded for her help. There is also nothing disputing the bar patron's testimony that Yolanda appeared to be reaching out for her son. Yolanda also admits that she was told to back up, but only took one step back from the struggle. Based on the totality of circumstances existing at the time, the Court finds that even before Officer Wray stood up to arrest Yolanda, he had probable cause to arrest her for interfering with the arrest of her son.

### E. The Officers are entitled to qualified immunity.

The Officer Defendants also seek summary judgment based on qualified immunity. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009). "Qualified immunity balances two important interests–the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id..

In evaluating qualified immunity, the Court must evaluate two issues. First, whether the facts show the violation of a constitutional right. Saucier v. Katz, 533 U.S. 194, 201 (2001). Second, whether the right was "clearly established" at the time of defendant's misconduct. Id. "Qualified immunity is applicable unless the official's conduct violated a clearly established constitutional right." Pearson, 555 U.S. at 232.

For the reasons stated above, the Court finds that the undisputed facts establish that none of the Officer Defendants, including Officer Wray, violated Yolanda's constitutional rights. Because there was no violations of a constitutional right, the Officer Defendants are entitled to qualified immunity.

### F. The City and Police Department are entitled to summary judgment.

In order to prevail on her section 1983 claim against the City and Police Department, Yolanda must establish (1) the deprivation of a constitutional right, (2) a city policy that caused the deprivation, (3) that the policy rose to "deliberate indifference" to the plaintiff's constitutional right, and (4) that the policy was the moving force behind the constitutional deprivation. <u>Oviatt v. Pierce</u>, 954 F.2d 1470 (9th Cir. 1992).

Here, Defendants argue that the City does not have a policy or long standing practice that caused Yolanda's harm. Yolanda's opposition does not address this argument, and thus provides no evidence of a policy or custom of practice that caused her harm. For this reason alone, the Court finds the City and Police Department are entitled to summary judgment.

Additionally, for the reasons stated above, the Court finds that Yolanda has failed to establish the deprivation of a constitutional right. For this reason too, summary judgment is appropriate as to the City and Police Department. <u>Jackson</u>, 268 F.3d at 653 ("Neither a municipality nor a supervisor, however, can be held liable under § 1983 where no injury or constitutional violation has occurred. [Citations omitted.]").

### G. Yolanda Kalb has abandoned the state claims and they lack merit.

Defendants seek summary judgment of Yolanda's state-law claims. Yolanda concedes that the claims should be dismissed as duplicative of her federal claims. (*See Opp.*, 8:18–22.) Additionally, because the Court has found that probable cause existed to arrest Yolanda, and that the amount of force used was reasonable under the circumstances, Yolanda's state claims must be dismissed.

//
//
//
//

## IV. CONCLUSION & ORDER

For the reasons discussed above, the Court **GRANTS** Defendants' summary-judgment motion [Doc. 40].

**IT IS SO ORDERED.**

DATED: March 29, 2013

_____
Hon. Thomas J. Whelan
United States District Judge